Not for Publication

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JESSICA THOMPSON,<br><br>    Plaintiff,<br><br>    v.<br><br>SOUTH AMBOY COMPREHENSIVE TREATMENT CENTER,<br><br>    Defendant. | Civil Action No.: 18-9923 (ES) (JSA)<br><br>OPINION |

**SALAS, DISTRICT JUDGE**

  Before the Court is defendant South Amboy Comprehensive Treatment Center's ("SACTC") motion for summary judgment. (D.E. No. 40). Having considered the parties' submissions, the Court decides this matter without oral argument. Fed. R. Civ. Pro. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, the Court GRANTS in part and DENIES in part the motion.

**I. BACKGROUND**

  Plaintiff Jessica Thompson claims that her former supervisor, Edwin Rivera, sexually assaulted her during a weekend outing in Atlantic City. Thompson further claims that their former employer, SACTC, did not properly prevent or remedy the hostile work environment the assault caused and, in fact, retaliated against her for reporting it. She now sues SACTC for sex discrimination and retaliation under the New Jersey Law Against Discrimination ("NJLAD"), and for assault and battery and intentional infliction of emotional distress. (D.E. No. 1-1 ("Compl.")).

1

A.      **Factual Background**[1]

SACTC provides counseling and medication to individuals who are or were addicted to opioids.  (Thompson Dep. 40:12–16).  Thompson began working at SACTC in July 2015 as an office assistant.  (SUMF ¶ 1).  She was hired by Clinic Director Janet Ramos (Thompson Dep. 29:3–4), and she was supervised by Officer Manager Edwin Rivera (SUMF ¶ 2).

In March 2016, Ramos organized a trip to Atlantic City to celebrate the birthday of Anjail Andrews, a fellow employee of SACTC.  (Resp. ¶ 9).  The parties dispute whether the outing was a work event, although Thompson testified that she believed it was and that she felt pressured to attend.  (Thompson Dep. 107:1–15 & 109:9–25).

---

[1]     The Court primarily pulls these facts from SACTC's statement of undisputed material facts (D.E. No. 40-1 ("SUMF")) and its response to Thompson's counterstatement (D.E. No. 40-5 ("Resp.")).  Thompson did not explicitly respond to SACTC's SUMF, but she included a "Counter Statement of Facts" in her opposition brief (D.E. No. 41 ("Opp. Br.") at 1–5), which SACTC incorporated in its response.

As SACTC accurately notes, Thompson did not comply with Local Civil Rule 56.1.  (D.E. No. 40-6 ("Reply") at 2).  That rule requires the party opposing summary judgment to furnish "a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the [record]."  L. Civ. R. 56.1(a).  Thompson failed to furnish a statement of material facts that addressed each paragraph of SACTC's SUMF.  Moreover, several sentences of Thompson's "Counter Statement of Facts" lacked citations to the record.  (*See* Opp. Br. at 1–5).  The Court acknowledges these failures and SACTC's request that the Court deem its "asserted material facts admitted and undisputed."  (Reply at 3).  Alternatively, the Court notes it could require Thompson to respond to SACTC's SUMF and refile a separate statement of undisputed material facts, with each assertion supported with a citation to the record.

But for two reasons, the Court will not do that here.  First, this case need not suffer from additional delay.  Second, finding record support for Thompson's assertions was not difficult, and doing so caused the Court and SACTC little prejudice.  Though Thompson did not cite evidence supporting each individual sentence, the citations she provided at the end of each paragraph typically supported each sentence in the paragraph.  And the evidence Thompson most relied upon was her deposition testimony (D.E. No. 41-6 ("Thompson Dep."))—an aspect of the record both parties heavily relied upon and something the Court reviewed in its entirety.  Nor, based on Thompson's counterstatement and arguments in opposition to SACTC's motion, was it difficult to glean the factual disputes in this case.  *See Boswell v. Eoon*, 452 F. App'x 107, 112 (3d Cir. 2011) ("Permitting the non-movant to rely on its briefing and evidentiary submissions to dispute the movant's 56.1 statement is consistent with the requirement at summary judgment that federal courts 'view the facts in the light most favorable to the non-moving party.'  Boswell's briefing and expert report make clear that he disputes the City Defendants' contention that he did not appear to be visibly intoxicated during his encounter with Feaster. Given Boswell's briefing and factual submissions, it would be antithetical to the spirit of summary judgment to rely on his poorly worded Opposing 56.1." (quoting *Jakimas v. Hoffmann–La Roche. Inc.*, 485 F.3d 770, 777 (3d Cir. 2007))); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613 (3d Cir. 2018) (explaining that sanctions for noncompliance with Local Civil Rule 56.1 are discretionary).

On the morning of Saturday, March 26, Thompson and Rivera met at SACTC and drove to Atlantic City together. (Resp. ¶ 11). Once there, the group, which consisted of Thompson, Rivera, Ramos, Andrews, and two former SACTC employees, went to dinner and a go-go bar and then stopped at their hotel before going to a nightclub. (*Id.* ¶¶ 12–13 & 15). At each location, either Rivera or Ramos supplied Thompson with alcohol. (*Id.*).

After these events, in the hotel room, Thompson began to feel "extraordinarily intoxicated" and vomited in the room and then in the bathroom. (*Id.* ¶ 16). While she was alone in the bathroom vomiting, Rivera entered the bathroom, undressed himself, and showered. (*Id.* ¶ 18).

What happened next between Thompson and Rivera is undisputed for purposes of the pending motion. After vomiting, Thompson fell asleep on one of the hotel room beds and eventually woke up to Rivera in bed with her. (D.E. No. 40-3, Ex. A-5, March 31, 2016 Email from Thompson to Ramos ("March 31 Email") at 73).[2] Throughout the night, and without Thompson's consent and over her objections, Rivera penetrated her vagina with his fingers, tongue, and penis. (*Id.* at 73–74). Thompson fought Rivera but eventually submitted after feeling "helpless and powerless." (*Id.*; *see also* Thompson Dep. 153:4–13).

The parties dispute whether and to what extent Ramos and Andrews witnessed and/or were aware of what happened that evening between Thompson and Rivera. According to Thompson, Ramos saw Thompson vomiting and decided to get another hotel room for the evening. (Resp. ¶ 17; Thompson Dep. 131:5–8). Thompson also contends that both Ramos and Andrews knew Rivera showered while Thompson was sick in the bathroom, and that they both observed Rivera on top of her in bed and did nothing to remove him. (Resp. ¶¶ 19 & 20; Thompson Dep. 212:21–

---

[2] This exhibit is an email Thompson sent to Ramos a few days after March 26 detailing what had happened that evening. Citations to this exhibit rely on pagination automatically generated by CM/ECF. There was some dispute concerning the authenticity of the email at Thompson's deposition. (Thompson Dep. 227:11–228:23). But neither party disputes its authenticity here.

3

22 & 152:6–11). Although Thompson testified to these facts, SACTC disputes them. SACTC also responds, not inconsistently, that Ramos and Andrews checked on Thompson and called Rivera multiple times that evening. (Resp. ¶ 20 (citing Thompson Dep. 158:7–15)).

The next morning, the group gathered for breakfast. (Thompson Dep. 157:4). During breakfast, Rivera told the group that he "Cosby-d" Thompson, which SACTC does not dispute. (Resp. ¶ 21; *see also* Thompson Dep. 156:24–158:25). After Rivera made that statement, there "was kind of like an awkward silence" and everyone seemed "uncomfortable." (Thompson Dep. 238:18–22). Thompson testified that the "Cosby'd" comment meant that Rivera was saying he drugged her, in light of the then-recent allegations concerning Bill Cosby. (*Id.* at 238:10–14). After breakfast, Thompson rode back to SACTC with Rivera and Andrews. (Resp. ¶ 21).

What happened after the incident is heavily disputed by the parties. Thompson testified that on Monday, March 28, she returned to work, with Rivera there, and reported the assault to a co-worker, who then reported it to Ramos the following day. (Thompson Dep. 239:9–11). On that Tuesday evening, Thompson spoke to Ramos about the assault. The parties dispute what happened during that conversation. According to Thompson, Ramos "acted as though like she didn't know what [Thompson] was referring to," told Thompson there was "nothing that she c[ould] do about it," and advised Thompson that she would "have to file a police report." (*Id.* at 239:9–23). After Thompson asked if she could contact human resources, Ramos told her to write a letter that Ramos would send to that office. (*Id.* at 239:23–25). Although SACTC disputes this order and version of events, it provides no evidence contradicting Thompson's account. (Resp. ¶¶ 24–25).

Following their meeting, Thompson sent Ramos two emails detailing the assault. (D.E. No. 40-3, Ex. A-4, March 30 Email from Thompson to Ramos; March 31 Email; SUMF ¶ 7). And

4

the next day, Ramos forwarded Thompson's emails to Shannon Slade, a human resources representative. (SUMF ¶ 11; D.E. No. 40-3, Ex. A-4). Thompson requested a leave of absence, which SACTC granted. (SUMF ¶ 10). According to Thompson, she requested leave when she spoke to Slade on the phone about the incident because she felt "uncomfortable," her "anxiety was through the roof," and she "couldn't be there while [Rivera] was there." (Thompson Dep. 190:10–19).

On April 4, Slade and Thompson met to discuss the evening of March 26. (SUMF ¶ 12). According to Thompson, Slade appeared "surprised" and "shocked" upon learning that Ramos organized and was on the trip and that the group had been drinking. (Thompson Dep. 242:8–243:12–14).

The day after Slade and Thompson met, SACTC terminated Rivera. (SUMF ¶ 13). Three days later, Slade and Ramos called Thompson and told her she could return to work because Rivera was fired. (*Id.* ¶ 15). However, Thompson resigned. (*Id.* ¶ 16). According to Thompson, she resigned because of Ramos—she thought that she could return to work if Rivera was gone, but she believed Ramos was upset with her, making her feel intimidated and hesitant to return to work for fear of retaliation. (Thompson Dep. 192:9–17 & 193:4–5). Further, in her resignation letter, Thompson indicated that "the response [to my complaint] has also been disappointing and has led me to believe that the people I work with, individuals to whom I put my trust and confidence in, in actuality do not have my best interests at heart—professionally or personally." (D.E. No. 41-3, April 8, 2016 Email from Thompson to Slade). "I can no longer trust," she went on, "the judgment of my superiors and co-workers[,] and I no longer can commit to working within an environment where I firmly believe that my safety, security, and legal rights as employee remain at risk." (*Id.*).

5

### B. Procedural History

On October 10, 2017, Thompson filed suit against SACTC, CRC Health Corporate Office, Rivera, and Ramos in the Superior Court of New Jersey, Law Division, Bergen County. (D.E. No. 1, Notice of Removal ("Removal") ¶¶ 1–2). Thompson asserted claims of sex discrimination and retaliation under the NJLAD; assault and battery; intentional infliction of emotional distress; aiding and abetting; negligent failure to prevent sexual assault; and negligent hiring, retention, and supervision. (Compl. ¶¶ 42–81). On May 4, 2018, the Superior Court dismissed CRC Health Corporate Office, Rivera, and Ramos for lack of prosecution. (Removal ¶ 2; *see also* D.E. No. 1-1, Ex. 2). With those parties dismissed, the case was then removable to federal court based on diversity jurisdiction. (Removal ¶¶ 4–7). On May 31, 2018, SACTC timely removed the action to federal court. (*Id.* ¶ 12 (citing 28 U.S.C. § 1446(b)(3))).

SACTC moves for summary judgment. (D.E. No. 40). Though Thompson opposes summary judgment on all her claims, she has indicated an intention to withdraw her aiding and abetting and negligence claims. (Opp. Br. at 19 n.2). Without further discussion, the Court grants SACTC's motion for summary judgment on those claims.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when—in viewing the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmovant—a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the burden of establishing that no "genuine issue" of facts exists. *Aman v. Cort Furniture Rental Cop.*, 85 F.3d 1074, 1080 (3d Cir. 1996). This burden is satisfied by

"produc[ing] evidence showing the absence of a genuine issue of material fact" or, if the nonmovant bears the burden of proof at trial, by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)

If the party seeking summary judgment makes this showing, it is left to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner*, 247 F. App'x 353, 354 (3d Cir. 2002) (quoting *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002)).  In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  Credibility determinations are the province of the fact finder.  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.   DISCUSSION[3]

SACTC does not dispute that Rivera assaulted Thompson.  Instead, it argues, *inter alia*, that Thompson did not suffer a hostile work environment because the assault took place out of the office and Rivera was promptly terminated after it was reported, and that SACTC cannot be held vicariously liable anyway because Rivera's conduct was outside the scope of his employment and

---

[3]   For the analysis that follows, the Court relies on the facts and corresponding record citations introduced above.

7

SACTC exercised due care in remedying the situation.

### A. NJLAD Claims

Before addressing Thompson's NJLAD claims, the Court rejects her attempt to reframe those claims as under Title VII of the Civil Rights Act of 1964. (*See* Opp. Br. at 10 ("In order to state a claim for sexual harassment under Title VII . . . .")). Her complaint does not mention Title VII, and the opening paragraph of her complaint explicitly says "[t]his is an action brought under the New Jersey Law Against Discrimination." (Compl. ¶¶ 42–81). Moreover, if she did assert a federal claim, then removal to federal court would have been untimely. Removal was timely only because the Superior Court dismissed the non-diverse defendants, thus creating diversity jurisdiction, months after Thompson filed her complaint. That Thompson did not object to removal indicates she never sought to bring a federal claim until now. Because a plaintiff may not amend her complaint through arguments in opposition to summary judgment, *see Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008), the Court will proceed to address Thompson's NJLAD and other state law claims.

#### i. Sex Discrimination

The NJLAD explicitly prohibits sex discrimination in the workplace, *see* N.J.S.A. § 10:5-12(a), and "[s]exual harassment is a form of sex discrimination," *Lehmann v. Toys R Us, Inc.*, 626 A.2d 445, 452 (N.J. 1993). There are two categories of sexual harassment cases: (i) quid pro quo sexual harassment, which occurs when an employer conditions certain things on sexual demands; and (ii) hostile work environment sexual harassment, which "occurs when an employer or fellow employees harass an employee because of his or her sex to the point at which the working environment becomes hostile." *Id.* This case falls under the latter category.

A claim of hostile work environment sexual harassment has four elements: The plaintiff "must show that the complained-of conduct (1) would not have occurred but for the employee's protected status, and was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive." *Shepherd v. Hunterdon Developmental Ctr.*, 803 A.2d 611, 625 (N.J. 2002). There must also be a basis for employer liability, be it direct liability or vicarious liability. *See Lehmann*, 626 A.2d at 459–60.

### a.     *Hostile Work Environment Sexual Harassment*

The first element of the claim is not in dispute. *See Lehmann*, 626 A.2d at 454 ("[W]hen a plaintiff alleges that she has been subjected to sexual touchings . . . , she has established that the harassment occurred because of her sex."). SACTC disputes the latter three elements, arguing that the conditions of Thompson's employment were not altered by severe or pervasive conduct. (D.E. No. 40-2 ("Mov. Br.") at 7–9).

The latter three elements, "while separable to some extent, are interdependent." *Lehmann*, 626 A.2d at 453. Indeed, "a court cannot determine what is 'severe or pervasive' conduct without considering whether a reasonable person would believe that the conditions of employment have been altered and that the working environment is hostile." *Shepherd*, 803 A.2d at 625. SACTC argues that Thompson cannot satisfy those standards because the assault took place outside of the office, SACTC promptly terminated Rivera, and Thompson worked with Rivera only for one day following the assault, before the assault was reported to Ramos. (Mov. Br. at 7–9).

The Court disagrees. The New Jersey Supreme Court has recognized that, in "a rare and extreme case," a "single incident" may be "so severe that it would, from the perspective of a reasonable woman, make the working environment hostile." *Lehmann*, 626 A.2d at 455. If any

9

single incident constitutes a rare and extreme case, it is when a supervisor rapes a subordinate. *K.S. v. ABC Pro. Corp.*, 749 A.2d 425, 427 (N.J. Super. Ct. App. Div. 2000) ("Rape is surely the ultimate form of sexual harassment."). Even though Thompson worked with Rivera for one day, there is evidence from which a jury could conclude that her one day in the office was a hostile environment for Thompson. Moreover, a reasonable jury could find that the assault forever permeated her experience at SACTC. As the New Jersey Supreme Court has said, "harassment by a supervisor that takes place outside of the workplace can be actionable," and "[c]onduct that takes place outside of the workplace has a tendency to permeate the workplace." *Blakey v. Cont'l Airlines, Inc.*, 751 A.2d 538, 549 (N.J. 2000)

In support of a contrary conclusion, SACTC cites *Kokinchak v. Postmaster Gen. of the United States*, 677 F. App'x 764 (3d Cir. 2017). (*Id.* at 8). There, the Third Circuit affirmed an award of summary judgment in favor of an employer where the theory of hostile work environment was that, during the course of the plaintiff's employment, she experienced a former harasser's sporadic presence and one instance in which he bumped into her. *Id.* at 766–67. The court explained "there is no *per se* rule of hostile work environment when a plaintiff is forced to work in proximity with a former harasser." *Id.* at 768. And it noted "the presence of a former harasser is a relevant factor in assessing the totality of the circumstances." *Id.*

*Kokinchak* is inapposite. There, the Third Circuit applied federal antidiscrimination law; it did not purport to apply the NJLAD. *See id.* at 766–68. Moreover, Thompson's circumstances are factually dissimilar. Whereas the former harasser in *Kokinchak* spoke to the plaintiff and touched her in inappropriate ways, it is undisputed, for purposes of this motion, that Rivera raped Thompson. That distinction is crucial—not because other forms of sexual misconduct are appropriate but because, as stated above, "[r]ape is surely the ultimate form of sexual harassment."

*K.S.*, 749 A.2d at 427. And whereas the plaintiff in *Kokinchak* sued for being in the presence of her former harasser almost ten years after the underlying harassment, Thompson was in Rivera's presence at work two days after the assault. And a reasonable jury could find that Thompson's working environment was hostile not only from Rivera's presence but also from the permeating effects of the assault.

SACTC's other arguments concerning where the assault occurred, by whom it was committed, and the employer's response to it are more appropriately relevant to the question of to what extent an employer may be held liable for the hostile work environment. *See id.* at 428 ("The employer's conduct becomes relevant only when compensatory and punitive damages are sought, as is the case here."). The Court will address that issue next.

### b. Vicarious Liability

"If a plaintiff establishes that she was sexually harassed by her supervisor, then the question remains whether the employer is vicariously liable for the supervisor's harassment." *Lehmann*, 626 A.2d at 459–60. "[I]n cases of supervisory sexual harassment . . . , the employer is directly and strictly liable for all equitable damages and relief." *Id.* at 460. Thompson does not seek equitable damages and relief. (Compl. at 12). Instead, she seeks compensatory and punitive damages. (*Id.*).

Whether an employer is liable for compensatory and punitive damages is "governed by agency principles." *Id.* at 461. For compensatory damages specifically, the general rule is that an employer is liable for wrongs an employee commits within the scope of his employment, and not liable for wrongs the employee commits outside the scope of his employment. *Id.* at 461–62. However, for wrongs an employee commits outside the scope of his employment, an employer may be liable under one of "four exceptions to the general rule":

11

>> (a) the master intended the conduct or the consequences, or
>
>> (b) the master was negligent or reckless, or
>
>> (c) the conduct violated a non-delegable duty of the master, or
>
>> (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

*Aguas v. State*, 107 A.3d 1250, 1260 (N.J. 2015) (quoting Restatement (Second) of Agency § 219). There is a higher standard for punitive damages: "the employer should be liable for punitive damages only in the event of actual participation by upper management or willful indifference." *Lehmann*, 626 A.2d at 464.

The Court will quickly rule out all but one possible basis for vicarious liability for compensatory damages. There is no basis to conclude Rivera acted within the scope of his employment when he assaulted Thompson. Thompson appears to suggest the opposite when she argues that the trip to Atlantic City was a work event. (Mov. Br. at 8–10). But even if the trip was a work event, "patently, the rape of an employee committed by a supervisor outside the workplace is beyond the scope of the supervisor's employment." *K.S.*, 749 A.2d at 428; *cf. Lehmann*, 626 A.2d at 464 ("We think that in some cases strict liability would be unjust—for example, where a supervisor rapes one of his subordinates in the workplace." (quotation marks and citation omitted)). As SACTC points out, "[a]ssault is not the kind of work [SACTC] employed Rivera, an office manager, to perform," and "nothing in the record suggests that Rivera's alleged conduct was anything other than an individual wrong motivated by personal reasons." (Mov. Br. at 6). Moreover, there is no evidence that SACTC intended for Rivera to assault her, that Rivera violated a non-delegable duty of SACTC, that Rivera purported to act on behalf of SACTC in assaulting Thompson, or that Rivera was aided by the existence of the agency relationship.

12

However, SACTC can be liable for compensatory damages if a reasonable jury could find that SACTC was negligent or reckless. Thompson argues that summary judgment is improper on this issue because there are several genuine disputes of material fact that require a jury's determination. (Opp. Br. at 12–16). The Court agrees.

"An employer may . . . be held vicariously liable for compensatory damages for supervisory sexual harassment that occurs outside the scope of the supervisor's authority if the employer had actual or constructive notice of the harassment" and negligently or recklessly failed to discharge its duty to prevent or remedy the harassment. *Lehmann*, 626 A.2d at 464; *see also Blakey*, 751 A.2d at 543 ("[I]f the employer had notice that co-employees were engaged on such a work-related forum in a pattern of retaliatory harassment directed at a co-employee, the employer would have a duty to remedy that harassment."). Indeed, "harassment by a supervisor that takes place outside of the workplace can be actionable," because, as stated above, "[c]onduct that takes place outside of the workplace has a tendency to permeate the workplace." *Blakey*, 751 A.2d at 549. Thus, SACTC can be liable for compensatory damages if a reasonable jury could find that it (i) had actual or constructive notice of the harassment and (ii) failed to discharge its duty to prevent or remedy the harassment.

As Thompson points out, a reasonable juror could find that SACTC had constructive notice of the assault. (Opp. Br. at 14). As Thompson points out, Ramos is "the most senior supervisor" at SACTC. (*Id.* at 15). Indeed, Ramos is the Clinic Director, and she was on the trip. She had the power to hire and fire and was closely involved in investigations of sexual harassment at SACTC. A juror could thus properly consider her "upper management" of SACTC, making it "fair and reasonable" to impute liability on SACTC for her actions and inactions. *See Cavuoti v. New Jersey Transit Corp.*, 735 A.2d 548, 559 (N.J. 1999). And, as set forth above, Ramos's actions and

inactions are in dispute. Perhaps most relevant, the parties dispute what exactly Ramos witnessed in the hotel room on March 26. (Thompson Dep. 131:5–8, 152:6–11 & 212:21–22). A jury must resolve this factual dispute–that is, whether SACTC, through Ramos, had constructive notice of the assault. *Torres v. Pisano*, 116 F.3d 625, 634 n.14 (2d Cir. 1997) (cited favorably by *Cavuoti*, 735 A.2d at 560) ("An employer can be held liable if it had constructive notice of the harassment, that is, if officials sufficiently high in the management hierarchy should have gained knowledge of it through the exercise of reasonable care."); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 789 (1998) ("There have, for example, been myriad cases in which District Courts and Courts of Appeals have held employers liable on account of actual knowledge by the employer, or high-echelon officials of an employer organization, of sufficiently harassing action by subordinates, which the employer or its informed officers have done nothing to stop.").

Moreover, factual disputes remain as to whether SACTC reasonably discharged its duty to prevent or remedy the harassment. (Opp. Br. at 12–16). The underlying disputes surrounding Ramos's involvement leading up to, during, and after the assault are factual issues that a jury must determine. Thompson has put forth evidence that Ramos organized the trip to Atlantic City, provided Thompson with drinks, observed her becoming intoxicated and resultingly ill, and nevertheless left her alone in the hotel room with Rivera while he was naked. Moreover, there is evidence in the record suggesting Ramos witnessed Rivera on top of Thompson. The next morning, according to Thompson, Rivera told the group, which included Ramos, that he "Cosby'd" Thompson. With knowledge of these facts, Ramos did not intervene at the time, nor did she report the incident or take any action until Thompson approached her. And when Thompson did approach Ramos, according to Thompson, Ramos acted as though she did not know what Thompson was talking about, told Thompson there was nothing that she could do about it, and advised Thompson

that she would have to file a police report. SACTC took no action against Ramos, which a reasonable jury could find negligent if Ramos was materially involved or aware of the events of March 26, failed to intervene or respond herself, and failed to exercise her duty reasonably to respond to Thompson's complaint.

SACTC disputes various aspects of Thompson's account, but that only means genuine disputes of fact remain. And those disputes are material because they bear on whether SACTC— either through Ramos's conduct or its own—failed to discharge its duty to prevent or remedy the harassment. A jury can reasonably conclude either way on those issues—both Ramos's awareness and SACTC's remedial response. Thus, construing the evidence in the light most favorable to Thompson, as the Court must, there is enough evidence in the record from which a reasonable jury could conclude that SACTC failed to discharge its duty to prevent or remedy the harassment.

To be sure, there are undisputed facts in the record favorable to SACTC's response. Indeed, SACTC accurately points out in reply that it "immediately separated [Thompson] and Rivera by granting [her] leave request, investigated the alleged assault, and terminated Rivera." (Reply at 6). Moreover, it is undisputed that human resources held a Title VII sexual harassment seminar two days after learning of the assault, and that SACTC had a policy prohibiting sexual harassment and retaliation. (Resp. ¶ 29; SUMF ¶ 5). While these considerations are relevant to SACTC's affirmative defense that it had a policy against discrimination in place, trained employees on the policy, and enforced the policy against wrongdoers, *see Aguas*, 107 A.3d at 1269, such issues are fact intensive, *see id.* at 1262, 1264. And Thompson, for her part, disputes the extent to which SACTC actually trained employees on the policy. (Opp. Br. at 13 ("Thompson testified that she never received any training on Sexual Harassment or Title VII during her orientation or at any other time while working as an employee for Defendant. Instead, Thompson

15

testified that she merely signed documentation confirming that she received such training because her supervisor required that she sign the documentation prior to starting work at Defendant's workplace." (citations omitted))). In ruling on a motion for summary judgment, the Court cannot act as factfinder. It is the jury's role to weigh competing evidence. The Court must rule, simply, whether there are triable issues for a jury. There are in this case.[4]

### ii. Retaliation under the NJLAD

To state a claim of retaliation under the NJLAD, a plaintiff must demonstrate that: "(1) plaintiff was in a protected class; (2) plaintiff engaged in protected activity known to the employer; (3) plaintiff was thereafter subjected to an adverse employment consequence; and (4) that there is a causal link between the protected activity and the adverse employment consequence." *Victor v. State*, 4 A.3d 126, 141 (N.J. 2010) (citing *Woods–Pirozzi v. Nabisco Foods*, 675 A.2d 684, 695 (N.J. Super. Ct. App. Div. 1996)). Assessing the element of causation "necessarily involves an inquiry into the motives of an employer." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997).

SACTC does not argue a lack any retaliatory motive. (*See* Mov. Br. at 11–14). Instead, it argues that Thompson did not suffer an adverse employment action because she "was not discharged, required to retire, or discriminated against in compensation or in terms, conditions or privileges of employment." (*Id.* at 12).

---

[4] Though the Court has discussed SACTC's remedial response through the lens of vicariously liability, its response could also be viewed from the angle of direct liability. "Although an employer's liability for sexual harassment of which the employer knew or should have known can be seen to flow from agency law, it also can be understood as direct liability." *Lehmann*, 626 A.2d at 464. "When an employer knows or should know of the harassment and fails to take effective measures to stop it, the employer has joined with the harasser in making the working environment hostile." *Id.* "The employer, by failing to take action, sends the harassed employee the message that the harassment is acceptable and that the management supports the harasser." *Id.*

But SACTC applies the wrong standard. To bring a retaliation claim under the NJLAD, a plaintiff need only show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Roa v. Roa*, 985 A.2d 1225, 1236 (N.J. 2010) (internal quotation marks omitted) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61 (2006)). Viewing the facts in the light most favorable to Thompson, a reasonable factfinder could determine that SACTC's response to Thompson's report would dissuade a reasonable worker from making a charge of discrimination. As outlined above, there is evidence in the record suggesting, and from which a reasonable jury could find, that in response Thompson's report, Ramos—the Clinic Director—acted as though she did not know what Thompson was talking about, told Thompson there was nothing that she could do about it, and advised Thompson that she would have to file a police report. A jury will have to determine whether SACTC's overall response to Thompson's complaint, coupled with its decision not to take action against Ramos, would dissuade a reasonable person from supporting a charge of discrimination, all things considered.

### B.     Assault and Battery, and Intentional Infliction of Emotional Distress Claims

To hold an employer liable for the intentional torts of its employee, the employee generally must have been acting within the scope of his employment. *See Carter v. Reynolds*, 815 A.2d 460, 463 (N.J. 2003). Thompson concedes Rivera acted outside the scope of his employment, but she argues that he acted with apparent authority because the trip to Atlantic City was work-related and organized by Ramos. (Opp. Br. at 18–19). But Thompson does not cite any support, and the Court has not found any, for the proposition that an employee acts with apparent authority simply because

he acted in a space that is work-related. Accordingly, the Court agrees with SACTC that it is entitled to judgment as a matter of law on these claims. (Mov. Br. at 15–16).

## IV. CONCLUSION

For the reasons set forth above, SACTC's motion for summary judgment is DENIED in part and GRANTED in part. An appropriate Order follows.


Date: August 27, 2021                                                  */s/Esther Salas*
                                                                                                Esther Salas, U.S.D.J.